Tiffany A. Harris
Attorney at Law
333 SW Taylor St., Suite 300
Portland, Oregon 97204
t. 503.782.4788   f. 503.217.5510
tiff@harrisdefense.com

Attorney for Defendant Fredric Russell Dean

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:18-CR-00119-SI |
| Plaintiff, | |
| v. | MOTION TO REDUCE SENTENCE PURSUANT TO |
| FREDRIC RUSSELL DEAN, | 18 U.S.C. § 3582(c)(1)(A)(i) (COMPASSIONATE RELEASE) |
| Defendant. | |

Defendant, Fredric Dean, through his attorney, Tiffany A. Harris, respectfully moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to reduce his sentence to time served. As amended by the First Step Act, the compassionate release statute now empowers district courts to reduce sentences for "extraordinary and compelling" reasons. Mr. Dean's cancer, history of immune-suppressive chemotherapies, other underlying health conditions, and the attendant risk of serious or fatal complications from COVID-19, provide an extraordinary and compelling basis for sentence reduction.

Mr. Dean has been incarcerated for nearly 27 months, most recently, under the authority of Sheridan Federal Correctional Institution.  Crediting "good time," he has served over 40% of

his original sentence.  He becomes eligible for half-way house placement under the Second Chance Act Program in 26 months.

Mr. Dean's request of the Court is simple.  He asks the Court to fashion an order that allows him to serve up to 26 months in home confinement under conditions that will continue to exact a just punishment, provide deterrence, and protect the public, without doing irreparable harm to his health by exposing him to an undue risk of serious illness or death from COVID-19.  The Court can reach this result by reducing Mr. Dean's custodial sentence to time served and ordering him to remain under home confinement for up to 26 months as a condition of supervised release.  Mr. Dean agrees to supervised release conditions that would include GPS location monitoring, that would confine him to his mother's property, and would not allow him to leave except for approved medical treatment and appointments deemed essential by the United States Probation Department (such as random urinalysis testing, if it could not be accomplished from home).

The property where Mr. Dean proposes to be housed was investigated and approved by the United States Probation Department on May 29, 2020:

> The inmate proposes to live with his mother, Nancy Behm. On May 28, 2020, a telephone discussion was conducted with Nancy Behm. The residence is a three-bedroom, two bathroom house in a rural part of Blue River. Dean would have his own room in the residence, with the only other occupant being Nancy Behm. Nancy Behm advised there is a firearm in the house to protect from wildlife. The firearm would be removed if Dean is released to the residence. There are no drugs or alcohol including medical marijuana in the residence. Nancy Behm did not object to the search condition contained in the judgment. Behm stated she is retired and would be able to transport Dean to medical appointments as well as any court obligations. The home plan is deemed acceptable. At this time, under the current circumstances, the release plan is deemed acceptable and the U.S. Probation office is willing to accept supervision of the inmate's case upon release from the Bureau of Prisons.[1]

---

[1] The Probation Department's May 29, 2020 report is attached as Exhibit 1.

**MOTION   TO   REDUCE   SENTENCE   PURSUANT   TO   18   U.S.C.   §   3582(C)(1)(A)(i) (COMPASSIONATE RELEASE)**

Mr. Dean's family is committed to preserving his health and supporting him through a period of home confinement and eventual community-based supervision.  Mr. Dean, now aged 41, living with cancer, and with more than two years of abstinence from controlled substances, wishes to permanently relocate to the rural property where he would be confined.

## I.    Relevant Facts and Procedural History

### A.  Indictment and sentencing

On March 6, 2018, Mr. Dean made his first appearance on a supervised release violation warrant in case number 3:13-CR-00137-SI.  The alleged violations of supervised release were the basis for the indicted charges in this case:  two counts of Possession of an Unregistered Firearm under 26 U.S.C. § 5861(d) and one of count Felon in Possession of a Firearm under 18 U.S.C. § 922(g).  On March 20, 2019, Mr. Dean entered a change of plea to count 1 and stipulated to the supervised release violations in case number 3:13-CR-00137-SI.  On August 26, 2019, Mr. Dean was sentenced to 51 months prison, to be served consecutively to a 24-month supervised release revocation sentence in case no. 3:13-CR-00137-SI.

In advance of sentencing, both the presentence investigator and the defense reported on Mr. Dean's recent history of testicular cancer and his need for ongoing medical treatment (See Presentence Report, para. 72).   The defense requested and the Court adopted a judicial recommendation that Mr. Dean be designated to FMC Terminal Island, based on the availability of on-site medical facilities and access to neighboring hospitals in the Los Angeles area.  The defense sent a separate letter to the BOP designation center in Grand Prairie, Texas, advising them

of the medical basis for the Court's recommendation.[2]  Had the Bureau of Prisons not rejected the

Court's request, Mr. Dean would be at Terminal Island, a facility that now has a total of 691 cases

of coronavirus infection, with 70% of inmates testing positive.  Eight of Terminal Island's inmates

have died of COVID-19, including one last week, after reportedly "recovering" from his illness.[3]

### B. Health

On September 22, 2010, Mr. Dean reported to the health services office at Sheridan, for

examination of a "lump" in his testicle that had been present for roughly four months and had

"ache[d] intermittently."[4]  The Family Nurse Practitioner who examined Mr. Dean recorded no

clinical observations, and no plan for follow up, other than to declare the examination "normal"

with "no masses".[5]

In late November 2015-- back at Sheridan and serving his sentence on case no. 3:13-CR-

CR-00137-- Mr. Dean made three separate visits to the health services office in a two-day period,

reporting abdominal and flank pain at a "level 9 out of 10."[6]  Over the next three months, through

the end of February 2016, Mr. Dean returned with debilitating pain in his lower back and abdomen,

difficulty and pain with urination, "characterized by tea colored urine," a pain radiating from his

lower back to his groin, nausea, chills and severe leg and muscle cramps.[7]  Various of these

---

[2] Defense counsel's letter to Grand Prairie Designation Center, dated September 5, 2019 is attached as Exhibit 2.

[3] "Eighth Inmate at Terminal Island Dies of Covid-19," *Los Angeles Times* (May 28, 2020), available at https://knx1070.radio.com/articles/8th-inmate-at-terminal-island-dies-of-covid-19.

[4] Exhibit 3, BOP Health Services records, at page 1.

[5] Id.

[6] Id. at pp. 3-11.

[7] Id., pages 12-28; See also Exhibit 4, Opinion letter from Dr. Thomas McNalley, dated May 26, 2020.

ailments were "misdiagnosed as pyelonephritis, an infection of the kidneys," and Mr. Dean was "treated inappropriately on two occasions with antibiotics."[8] As his symptoms persisted, Mr. Dean was instructed to manage his pain by purchasing ibuprofen from the commissary.[9]

On May 18, 2016, Mr. Dean was re-sentenced on case no. 3:13-CR-00137, after the Court found that the original sentence was incorrectly calculated, in violation of the rules announced in *Johnson v. United States,* 576 U.S. 591 (2015). In advance of re-sentencing, the defense submitted a sealed letter to the Court, arguing that Mr. Dean was eligible for half-way house placement, having served all but six and a half months of the re-calculated guideline sentence, and thus, he should be sentenced to time served to hasten his access to medical care in the community, following what was believed to be a "severe and persistent kidney infection." The Court adhered to the recalculated  guideline sentence, but—recognizing the necessity of community-based medical care—included the following judicial recommendation in the Judgment:  "that the defendant be considered for the maximum term of pre-release placement in a half-way house pursuant to the Second Chance Act Program."

The BOP did not follow the Court's recommendation. On June 23, 2016, Mr. Dean sent the following "kite" to his counselor:

> "Mr. Cooper, I have made it back from court and was hoping you could start my half-way house packet for me. The judge asked for the most allowed and as fast as possible and that is in my documents on the case. I have however been stuck in the shipping system for a month. Thank you for your time."[10]

---

[8] Exhibit 4, McNalley letter; Exhibit 3, pp. 12-28.

[9] Exhibit 3, p. 36

[10]  Exhibit 7, copies of BOP inmate communications, p. 11-13.

On August 15, 2016 and August 16, 2016, Mr. Dean again requested that his application for half-way house placement be processed. He was transferred to the Northwest Regional Reentry Center (NWRRC) some time in November, with roughly one month left to serve on his sentence.[11]

Within days of his arrival at the NWRRC, on November 10, 2016, Mr. Dean presented to a local emergency room with severe pain, difficulty urinating, nausea, vomiting, and an unexplained weight loss of 15 pounds.[12] Doctors took a thorough history, ordered an abdominal CT scan, and detected a large, metastatic mass.[13] By November 22, 2016, within twelve days, Mr. Dean had imaging, a referral to an oncologist, and a diagnosis, confirmed by a pathologist, of left testicular seminoma, stage IIb.[14]

Mr. Dean underwent surgical removal of his left testicle on December 22, 2016, followed by "combination chemotherapy with three different chemotherapy drugs: bleomycin, etoposide and platinum (cisplatin), also known as BEP."[15] Because BEP is known to cause varying degrees of "cardiopulmonary complications" and "lung disease," Mr. Dean's oncologist ordered a pulmonary function test close in time to his diagnosis.[16] That baseline testing showed that, prior to chemotherapy, Mr. Dean already had "early lung damage, specifically, 'mild, early

---

[11] We do not have a records associated with Mr. Dean's transfer from Sheridan to the NWRRC. His family recalls taking him to the ER within days of his release from Sheridan, in early November.

[12] Exhibit 4, Opinion letter from Dr. Thomas McNalley, dated May 26, 2020; Exhibit 5, Providence Oncology Records, p. 1.

[13] Exhibit 4; Exhibit 5, Providence Oncology records, page 1.

[14] Exhibits 4; Exhibit 5, p. 8.

[15] Id.

[16] Id.

obstruction.'"[17]   Following those tests, Mr. Dean received rounds of BEP through March of 2017, "with complications of severe urinary tract infection, nausea, fatigue, migraine headache, paranoia and hallucinations, and both low back and generalized body pain." [18] In the aftermath of chemotherapy, Mr. Dean began to experience pain and "harshness" with breathing.[19]

Urinary tract infections, while rare for men, have been a recurrent, post-cancer complication for Mr. Dean in jail and prison.  Between November 2015 and February 2016, he was treated for persistent urinary symptoms and infection at Sheridan; on February 27, 2017, Providence Oncology treated him for a "UTI/cystitis"; on August 19, 2018, the Multnomah County jail diagnosed him with a urinary tract infection; On January 12, 2019, Sheridan diagnosed him with a urinary tract infection; on March 5, 2019, Mr. Dean requested medical treatment for a suspected urinary tract infection; on July 10, 2019, oncologist Catherine O'Brien (working on contract with BOP) wrote, "the patient is having frequent urinary tract infections and intermittent voiding issues which is distinctly unusual in a man his age so I am recommending he follow up with a urologist."[20]  To date, Mr. Dean has not seen a urologist.

The metastatic, abdominal tumor, originally detected in imaging studies in November of 2016, could not be surgically removed.[21]  It is being monitored for recurrence and causes ongoing symptoms of chronic pain, severe gastric reflux, lower intestinal distress, and interference with

---

[17] Id.

[18] Exhibit 4, McNalley letter.

[19] Exhibit 6, Multnomah County Jail records page 6.

[20] Exhibit 3, pp. 3-28, 30-33, 42-45; Exhibit 4; Exhibit 5, p. 9; Exhibit 6, p. 4.

[21] Exhibit 4, McNalley letter.

**Page 7 MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(i) (COMPASSIONATE RELEASE)**

sleep, as noted in jail and BOP records.[22] These symptoms have been particularly difficult for Mr.

Dean to manage at Sheridan, in part because the medications he was receiving in the local jail were

discontinued upon his arrival at Sheridan (pending trial on the instant case).[23]  On October 19,

2018, Mr. Dean submitted a kite, explaining, "I was going to try to buy medication for heartburn

and pain for my cancer that for some reason I can't get prescribed from you guy[s]. Now I can't

go to commissary for a group punishment. Can you help me out?..."[24] On December 8, 2018, Mr.

Dean saw Dr. Cantu who wrote,

> "Inmate claims or thinks he has a stomach tumor, he also stated that testicular
> cancer [sic] and it spread to his stomach. Inmate stated he has frequent heartburn /
> acid reflux, stomach pain / pressure…Inmate is requesting greater amounts of
> Rantidine [generic for Zantac, which has since been recalled by the FDA] than he
> can buy from the commissary…Review of commissary showing numerous
> purchases of spicy snacks and foods…Health Services administrator informs that
> [group] commissary privileges have been suspended for a period of time due to
> security violations…"[25]

---

[22] Exhibit 6, Multnomah County jail medical records, p. 6 (requesting permission to possess extra toilet paper: "The tumor at times causes hell to my digest[ive] tract…"); See also, see footnote 22.

[23] Exhibit 7, BOP inmate correspondence, Exhibit 7, inmate correspondence, p. 2 (January 29, 2018: "I have pain in my lower stomach; I have cancer in my lower stomach; I would like to see a doctor. Thank you"); Ex. 7, p. 10 (October 12, 2018 medical request: "I am dealing with a lot of pain daily and heartburn from cancer. I would like to see someone to get help."); Ex. 7, p. 3 (November 2, 2018: I am experiencing pains in my [abdomen], can I see a doctor please[?]"); Ex. 7, p. 4 (November 1, 2018 request for mental health treatment: "I am stressed out about life and my cancer needs not being met."); Ex. 7, p5 (February 15, 2019: "I need pain medication and heartburn medication. I am suppose[ed] to buy my medication from the commissary. Our commissary keeps getting taken from us."); Ex. 7, p. 8 (undated medical request: "I am still dealing with a lot of pain from stomach issues. I am also experiencing nausea and heartburn. I need to see someone please. Thank you."); Ex. 7, p.9 (undated medical request: "I am dealing with stomach pain. It was really bad this morning. I would like to see someone as soon as possible. Thank you.")

[24] Id., p. 1.

[25] Exhibit 3, p. 37.

---

**Page 8   MOTION   TO   REDUCE   SENTENCE   PURSUANT   TO   18   U.S.C.   §   3582(C)(1)(A)(i)
(COMPASSIONATE RELEASE)**

On September 9, 2019, Mr. Dean transmitted a medical request seeking "some meds for pain and heartburn," adding, "the commissary is closed and medical is not doing anything."[26] On October 17, 2019, Dr. Grasley wrote, "Patient with GERD…Notes that Zantac from the commissary is unable to fully control his [symptoms]. GERD symptoms are constant, wakes him up at night."[27]

Generally speaking, 80% of men with  cancers like Mr. Dean's are considered low risk for recurrence.[28]  Mr. Dean, however, is at higher risk for a poorer prognosis because of the cancer's infiltration into lymph nodes in his abdomen.[29]

### C.  The Coronavirus Pandemic

The toll of the COVID-19 pandemic on public health and the national economy has been well documented.  Americans are inundated daily with news of the highly contagious and devastating new strain of coronavirus, which causes COVID-19.  On March 11, 2020, the World Health Organization officially classified the new strain of coronavirus which causes COVID-19 as a pandemic.[30]  On March 13, 2020, President Donald Trump declared a national emergency based on the threat to public health posed by the virus.  On March 26, 2020, the United States

---

[26] Exhibit 7, p. 7.

[27] Exhibit 3, p. 44.

[28] Exhibit 4, McNalley letter.

[29] Id.

[30] *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020*, World Health Organization (Mar. 11, 2020), https://bit.ly/2W8dwpS. "COVID-19 is a serious disease" that makes certain populations of people severely ill and can lead to death.

**Page 9  MOTION   TO   REDUCE   SENTENCE   PURSUANT   TO   18   U.S.C.   §   3582(C)(1)(A)(i) (COMPASSIONATE RELEASE)**

became the global leader in COVID-19 infections.[31]  As of May 31, 2020, there were more than 1,761,503 known cases of COVID-19 in the United States and 103,700 Americans were dead of the disease.[32]  The number of confirmed COVID-19 cases continues to rise, but reported numbers underrepresent the true scope of the crisis, due to limited testing availability.[33]  Even as total numbers of COVID-19 infections and deaths worldwide have ticked downward, the virus has surged in places once believed to have controlled the outbreak.  For example, South Korea closed more than 500 of its Seoul-area schools after briefly reopening them.[34]

In the State of Oregon, where Sheridan FCI is located, the Governor issued a state of emergency on March 8, 2020 and a "stay-at-home" order for the entire state on March 23, 2020, stating:

> "In a short time, COVID-19 has spread rapidly. Additionally, some Oregonians are not practicing social distancing guidance from the Oregon Health Authority…To slow the spread COVID-19 in Oregon, to protect the health and lives of Oregonians, particularly those at highest risk, and to help avoid overwhelming local and regional healthcare capacity, I find that immediate implementation of additional measures is necessary."[35]

---

[31] Tom Porter, *The US is Well on the Way to Having a Coronavirus Outbreak Worse than China's or Even Italy's*, BUSINESS INSIDER (Mar. 26, 2020), https://www.businessinsider.com/figures-show-us-soon-coronavirus-worse-china-2020-3.

[32] CDC daily updates, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited, May 31, 2020).

[33] *See, e.g., New York Times* daily data, available at https://www.nytimes.com/interactive/2020/us/oregon-coronavirus-cases.html (last visited May 29, 2020); Alexis C. Madrigal & Robinson Meyer, *How the Coronavirus Became an American Catastrophe*, THE ATLANTIC (Mar. 21, 2020), https://www.theatlantic.com/health/archive/2020/03/how-many-americans-are-sick-lost-february/608521/

[34] *Hundreds of South Korea Schools Close Again After Briefly Reopening,* CNN https://www.cnn.com/2020/05/29/asia/south-korea-coronavirus-shuts-down-again-intl/index.html (May 29, 2020).

[35] Governor's Executive Order No. 20-12, available at https://govsite-assets.s3.amazonaws.com/jkAULYKcSh6DoDF8wBM0_EO%20-12.pdf

**Page 10 MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(i) (COMPASSIONATE RELEASE)**

At the time the stay-at-home order was issued, Oregon had 14 presumptive or confirmed cases of COVID-19.[36]  By the time of the stay-at-home order, there were 161 cases and five deaths.[37]  As of June 2, 2020, Oregon has 4,302 cases and 154 deaths.[38] Eighteen percent of Oregonians known or presumed to be infected have been hospitalized during the course of their illness.[39] The largest coronavirus outbreak is now at the Oregon State Penitentiary.[40]

The United States Department of Health and Human Services reports that individuals who contract and transmit COVID-19 experience a wide range of symptoms ranging from negligible— with some people remaining asymptomatic—to mild, such as fever, coughing, and difficulty breathing, to severe, including acute respiratory distress, severe pneumonia, septic shock, multi-organ failure, and death.[41]  The CDC estimates that serious illness or death occurs in 16% of cases.[42]

---

[36] Id.

[37] Id.

[38] Oregon Health Authority COVID-19 update, available at https://govstatus.egov.com/OR-OHA-COVID-19

[39] Id.

[40] "Oregon's Maximum Security Prison in Salem Now the Site of State's Single Biggest Coronavirus Outbreak," *Oregonian* (May 22, 2020), available at https://www.oregonlive.com/coronavirus/2020/05/oregons-maximum-security-prison-in-salem-now-the-site-of-states-biggest-single-coronavirus-outbreak.html

[41] CDC *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed May 21, 2020).

[42] CDC Situation Summary, https://www.cdc.gov/coronavirus/2019-ncov/summary.html (*last accessed* May 21, 2020).

The virus that causes COVID-19 is "quite transmissible through relatively casual contact."[43] It is "thought to spread mainly through close contact from person to person in respiratory droplets from someone who is infected."[44] A study published in *The New England Journal of Medicine* showed the virus to be stable for several hours in aerosols (i.e. respiratory droplets) and for several hours to days on surfaces.[45] The incubation period for COVID-19 extends 14 days on average, with a median time of 4-5 days from exposure to symptoms onset (versus the ordinary flu, which has an incubation period of just 1-4 days).[46] Recent studies support the long-held concern that the virus can be transmitted by asymptomatic carriers.[47]

The CDC recommends that, to avoid exposure and transmission, the public should maintain a physical distance of at least six feet from others, wear masks or cloth face covers, frequently wash hands or use hand sanitizer, and disinfect frequently touched surfaces.[48]   High-risk individuals (those with underlying health conditions placing them at increased risk of serious complications or death from COVID-19) are urged to take additional "special precautions," such as continuing active treatment of underlying medical conditions, obtaining vaccinations for other

---

[43]  "Study reveals how long covid-19 remains infectious on cardboard, metal and plastic," *Science News* (March 20, 2020) (https://www.sciencedaily.com/releases/2020/03/200320192755.htm

[44] CDC, *How COVID-19 Spreads,* https://www.cdc.gov/coronavirus/2019-ncov/faq.html#How-COVID-19-Spreads (last visited May 21, 2020)

[45] The study is summarized at https://www.sciencedaily.com/releases/2020/03/200320192755.htm (last visited May 21, 2020)

[46]     CDC,     https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html; healthline.com comparison of flu and coronavirus, available at https://www.healthline.com/health/coronavirus-vs-flu#differences (last visited May 31, 2020).

[47] CDC, Know how it spreads,   https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 21, 2020)

[48] CDC, https://www.cdc.gov/coronavirus/2019-ncov/downloads/disinfecting-your-home.pdf

influenza and pneumococcal illness, staying home, and remaining apart from others "as much as possible."[49]

Because of the highly infectious nature of COVID-19, jails and prisons are incubators for the disease, creating optimal conditions for its transmission.[50] The New York Times counted more than 47,000 coronavirus infections and 485 deaths of inmates and correctional staff in state and federal prisons and local jails.[51] An inescapable fact of prison life is that it's crowded-- inmates "live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."[52] The CDC recognizes the difficulty of preventing the introduction of COVID-19 into prison facilities:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits; and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.[53]

Four out of five of the largest outbreaks of COVID-19 in the United States were in detention facilities, and three of the largest coronavirus clusters are in prisons that have more than

---

[49] CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[50] Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007), https://doi.org/10.1086/521910.; "Jails Release Prisoners, Fearing Coronavirus Outbreak," *Wall Street Journal* (March 26, 2020)

[51] "Prisons have been overwhelmed by the virus," *New York Times*, May 28, 2020 available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html

[52] Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[53] Id.

**Page 13 MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(i) (COMPASSIONATE RELEASE)**

1,300 cases each.[54]  Across the BOP system, 52 facilities now have reported cases of COVID-19

infection.[55]  5,846 inmates and staff have, at one time, been infected with the coronavirus since the

start of the pandemic.[56] Sixty seven inmate deaths have been attributed to COVID-19.[57] And these

are just the *confirmed* infections.  As the district court in *United States v. Caddo* noted, "it is

unknowable whether BOP detainees or inmates have Covid-19 until they are tested, and BOP has

not conducted many or any such tests because, like the rest of the country, BOP has very few or

no actual Covid-19 test packets." Order at 5, *United States v. Caddo*, No. 3:18-cr-08341-JJT (D.

Ariz. Mar. 23, 2020) (ECF No. 174).

Experience shows that the coronavirus spreads quickly once it infiltrates a prison

environment.  By the time widespread testing was available at the coronavirus hotspots of Lompoc

Federal Correctional Complex and at FCI Terminal Island, 70% of all inmates at those facilities

had become infected.[58]

Courts around the country have acknowledged the unique and serious risks of COVID-19

infection to inmates and detainees during the pandemic.  *See, e.g., United States v. Stephens*, 2020

WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (describing the "unprecedented and

---

[54] "Prisons have been overwhelmed by the virus," *New York Times*, May 28, 2020 available at
https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html; *See also, See, Gomez v. U.S. Dep't of
Homeland Security, et al,* Civ. No. 20-cv-453-LM  (D.Nh May 14, 2020) (collecting data, discussing COVID-19
outbreaks in correctional settings and detention centers).

[55] Bureau of Prisons website, at www.bop.gov/coronavirus/ (last visited May 31, 2020)

[56] Id.

[57] Id.

[58] "70% of inmates test positive for coronavirus at Lompoc federal prison," *Los Angeles Times* (May 9, 2020)
https://www.latimes.com/california/story/2020-05-09/coronavirus-cases-lompoc-federal-prison-inmates; "Nearly
70% of Terminal Island inmates test positive for coronavirus as inmate dies, *Daily Breeze*, inmate dies," *Daily
Breeze* (May 9,  2020) https://www.dailybreeze.com/2020/05/09/nearly-70-of-terminal-island-inmates-testpositive-
for-coronavirus-as-7th-inmate-dies/

**Page 14 MOTION  TO  REDUCE  SENTENCE  PURSUANT  TO  18  U.S.C.  §  3582(C)(1)(A)(i)
(COMPASSIONATE RELEASE)**

extraordinarily dangerous nature of the COVID-19 pandemic" and recognizing that "inmates may be at heightened risk of contracting COVID-19 should an outbreak develop"); *United States v Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte order extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *Basank v. Decker,* No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *4 (S.D.N.Y. Mar. 26, 2020) ("[t]he nature of detention facilities makes exposure and spread of the virus particularly harmful."); *Coreas v. Bounds*, No. CV TDC-20-0780, 2020 WL 1663133, at *6 (D. Md. Apr. 3, 2020) (finding it implausible that "someone will be safer from a contagious disease while confined in close quarters with dozens of other detainees and staff than while at liberty.").

### III.    Argument

#### A.    The Court Has Authority to Consider the Pending Motion Because More than Thirty Days Have Elapsed Since the Request Was Received by the Warden.

Mr. Dean's request is ripe for review.  He submitted a request for reduction in sentence to the warden at Sheridan on April 22, 2020, more than 30 days ago, providing the basis for the Court to consider his motion. *See United States v. Spears*, No. 3:98-CR-0208-SI-22, 2019 WL 5190877, at *2 (D. Or. Oct. 15, 2019) (granting the defendant's compassionate release motion on the first business day after the 30-day period expired); *United States v. Robinson*, No. 16-CR-5307 BHS-5, 2019 WL 2567356, at *2 (W.D. Wash. June 21, 2019) (staying consideration of a compassionate release motion for exactly the 30-day period). The warden has had a full opportunity to review Mr. Dean's request and should be familiar with the medical concerns he raises.  Mr. Dean's medical conditions are documented in the PSR and BOP records.

**B.**     **Mr. Dean's Individualized Risk of Serious Complications or Death from a COVID-19 Infection Constitutes an Extraordinary and Compelling Reason for an Immediate Sentence Reduction to Time Served and Transfer to Home Confinement.**

The chronicle of Mr. Dean's emerging symptoms, belated diagnosis, and course of treatment within the BOP system demonstrate that—even under the best of circumstances—Mr. Dean's need for competent medical care exceeded the BOP's capacity to deliver it.  Now, along with the preexisting health needs of Mr. Dean and the rest of its inmate population, the BOP faces the outbreak of a highly infectious and sometimes lethal disease thriving in its densely populated prison facilities.  Under these unforeseen circumstances, the Court can no longer assume that the 75-month sentence it imposed on Mr. Dean will fulfill the statutorily mandated goals of providing the defendant with needed medical care and appropriate correctional treatment.  Indeed, the Court can no longer assume that Mr. Dean's original prison sentence will not become a sentence of death.

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction.  Black's Law Dictionary, however, defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," BLACK'S LAW DICTIONARY (11th ed. 2019).  Its definition of "compelling need," is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id.*  In Mr. Dean's case, the present global pandemic, and the unique threat it poses to his health and safety, is quintessentially an "extraordinary circumstance."

As the opinion letter of Dr. Thomas McNalley makes clear, Mr. Dean is at higher medical risk for serious complications from COVID-19, "rang[ing] from serious long-term cardiopulmonary compromise with prolonged hospitalization, including respiratory failure, shock,

acute respiratory distress syndrome (ARDS), and cardiac arrythmia to death."[59] According to Dr. McNalley, "persons with cancer, those who have had or are getting chemotherapy are all at more serious risk for more serious [COVID-19] illness in general due to a weakened immune system."[60] This makes sense— chemotherapy is powerful, but blunt instrument.  In addition to attacking the inflammatory molecules produced by cancer cells, it attacks healthy and vital cells throughout the body, including those lining the intestinal tract, encased within red and white blood cells, and essential to mounting a defense against infection.[61]  "This reduced ability to fight infection persists in some for many years after concluding their therapy, and indeed, even if pronounced "cured" from cancer."[62]  Thus, 35-45% of people with a history of cancer treatment experience a "more severe clinical course with COVID-19 infection, with severity defined by ICU admission, invasive ventilation, and death."[63]

Additionally, testicular cancer patients are more likely to have some degree of cardiovascular disease, especially those like Mr. Dean, who are treated with the BEP combination of chemotherapy agents.[64]  This is significant in assessing COVID-19 risk because "one of the most devastating complications of COVID-19 infection has been cardiac involvement."

The BEP protocol is also known to cause varying degrees of lung injury.  Mr. Dean *began*

---

[59] Exhibit 4, McNalley Letter

[60] Id.

[61] Id.

[62] Id.

[63] Id.

[64] Id.

BEP treatment with preexisting mild pulmonary obstruction and a history of smoking (he quit in recent years), and he developed pulmonary symptoms *after* the treatment concluded.

Mr. Dean's frequent urinary tract infections have exposed him to a range of antibiotic drugs. As Dr. McNalley explains, in the context of COVID-19 treatment, this history of antibiotic exposure could complicate Mr. Dean's ability to rebound from a secondary bacterial infection, with "particularly dire" results.[65] Dr. McNalley concludes: Mr. Dean's age, male sex, history of cancer and exposure to both bleomycin and cisplatin *each* place him in a higher risk category for severe COVID-19 infection.[66] It is probable that the *cumulative* risk is greater as well.[67]

Because there is no cure, no vaccine and no widely available or validated treatments for COVID-19, the only effective protection is social distancing. Yet, as a Bureau of Prisons inmate, it is impossible for Mr. Dean to take this basic precaution. He sleeps in a stacked bunk bed in a shared cell, roughly ten feet by eight feet. He must pack himself into densely populated areas to access a latrine, shower, telephone, food, and law library. He lacks the autonomy or resources to undertake the sanitation and hygiene protocols recommended for people in vulnerable health categories to minimize their contact with infected surfaces or people. The highly infectious nature of the coronavirus, the forced congregate living at Sheridan, and Mr. Dean's unique medical risks provide a compelling reason for Mr. Dean's sentence to be converted to home confinement.

At least to some degree, the BOP, itself, has acknowledged the functional impossibility of social distancing within its prisons. Under guidance from Attorney General Barr, the BOP has

---

[65] Exhibit 4, McNalley letter

[66] Id.

[67] Id.

already released more than 2,400 medically vulnerable inmates to home confinement, including Paul Manafort, who had served less than half of his prison sentence and whose facility had zero recorded cases of COVID-19 as of the date of Mr. Manafort's release.[68]

Across the country, district courts considering the plight of inmates with medical vulnerabilities during the pandemic have found extraordinary and compelling reasons to grant compassionate release.  As the Eastern District of Washington explained of one inmate's chronic disease, "[i]n normal times, defendant's condition would be manageable.  These are not normal times, however." *United States v. Gonzales*, 2:18-CR-00232-TOR-15, 2020 WL 1536155 (E.D. Was. Mar. 31, 2020); *See also*; *United States v. Hansen*, 1:07-cr-00520-KAM-2, 2020 WL 1703672 (E.D. N.Y. Apr. 8, 2020) (granting compassionate release to inmate with prostate cancer, in light of coronavirus pandemic); *United States v. Jolling,* No. 6:11-CR-60131-AA, 2020 WL 1903280 (D. Or. Apr. 17, 2020) (compassionate release of inmate with hypertension, atherosclerosis, transient ischemic attacks, dyslipidemia, obesity, cancer in light of coronavirus pandemic);  *United States v. Hunt*, 2:18-CR-20037-DPH-DRG, 2020 WL 2395222 (E.D. Mich. May 12, 2020) (compassionate release of inmate with conditions including asthma, obesity, diabetes, noting, "<u>when the court sentenced defendant, it did not intend for that sentence to include a great and unforeseen risk of severe illness or death brought about by a global pandemic</u>.") (Emphasis added.); *United States v. Connell*, 18-CR-00281-RS-1, 2020 WL

---

[68] "Come on, we're human beings: judges question response to coronavirus pandemic in federal prisons," *Washington Post* (May 13, 2020) available at https://www.washingtonpost.com/investigations/come-on-were-human-beings-judges-question-response-to-coronavirus-pandemic-in-federal-prisons/2020/05/12/925e5d32-912a-11ea-a9c0-73b93422d691_story.html

2315858 (N.D. Cal. May 7, 2020) (compassionate release of inmate with hypertension and other maladies in light of pandemic); *United States v. Harper*, 7:18-CR-00025-EKD-JCH-1, 2020 WL 2046381 (W.D. Va. Apr. 28, 2020) (compassionate release of inmate with COPD and other ailments in light of pandemic).

In light of how little is known about the actual numbers of infected people in jails and prisons, it is too risky to wait until coronavirus testing confirms the presence of COVID-19 infections at Sheridan. The belated testing efforts at Lompoc, Terminal Island and other BOP facilities illustrate the extent to which early official tallies of coronavirus infection underestimated the extent and rate of the virus' infiltration into BOP facilities.  Senators Richard Durbin and Chuck Grassley expressed similar concerns in an April 21, 2020 letter to the DOJ Inspector General:

> We are concerned that BOP is not fully and expeditiously implementing relevant statutory authority and directives from the Attorney General [to release inmates to home confinement].  We are also concerned about how closely BOP is following CDC guidance or taking other preventive measures to adequately protect BOP staff and inmates from the spread of COVID-19.  We also worry that BOP is significantly underestimating the rate of COVID-19 infection in BOP facilities because BOP has not yet conducted the number of tests on staff or inmates appropriate for facilities where a highly contagious virus can be easily spread.[69]

For these reasons, our own district has already found "extraordinary and compelling reasons" may justify the release inmates in high risk categories from Sheridan, despite the fact that, so far, there have been no announced cases of coronavirus infection.  *United States v. Etzel*, 6:17-CR-00001-AA (D. Or. May 1, 2020) at p. 8 ("While there have been no identified cases of COVID-19 at FCI Sheridan, infection can spread at deadly speed."); *See also, United States v.*

---

[69]   The full text of the letter is available on Senator Durbin's official website: https://www.durbin.senate.gov/newsroom/press-releases/durbin-grassley-press-doj-ig-to-review-implementation-of-first-step-act-and-cares-act-in-bop-covid-19-investigation

*Atkinson*, No. 2:19-CR-55 JCM (CWH), 2020 WL 1904585, **2-4 (D. Nev. Apr. 17, 2020) (noting the inability of higher risk inmates to follow CDC guidelines while confined); *United States v. Asaro*, No. 17-CR-127 (ARR), 2020 WL 1899221 (E.D.N.Y. April 17, 2020) ("Absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility"); *United States v. Burrill*, No. 17-CR-00491-RS-1, 2020 WL 1846788, at *4 (N.D. Cal., April 10, 2020) ("Prison conditions mean incarcerated individuals, as well as society as a whole, are safer the more defendants are released."); *United States v. Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020); *United States v. Ben-Yhwh*, No. CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020).  This court adopt the same approach, especially in this case, where the risks to Mr. Dean's health are well documented and can be avoided with a home confinement plan that offers a high level of monitoring and structure.

### C.   With Full Consideration of the § 3553(a) Factors, Including the COVID-19 Pandemic, Mr. Dean's Time Served, Plus the Proposed Home Confinement Constitutes a Sentence Sufficient, but Not Greater than Necessary, to Accomplish the Goals of Sentencing.

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in18 U.S.C. § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Those factors include the circumstances of the underlying offense, the nature and characteristics of the defendant, consideration of the kinds of sentences available, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide needed training, medical care and correctional treatment in the most effective manner.

Under *Pepper v. United States*, 562 U.S. 476, 490-93 (2011), the Court can consider post-offense developments under § 3553(a).  Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic.  Although the circumstances of the present offense warranted the 75-month sentence this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness.  Indeed, the Eighth Amendment's prohibition on cruel and unusual punishment contemplates unreasonable exposure to dangerous conditions of confinement. *Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074, 1076 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to contagious diseases caused by overcrowding conditions).

This Court is familiar with Mr. Dean's history and characteristics from sentencing submissions filed as a confidential supplement to the PSR, chronicling Mr. Dean's history of childhood neglect and victimization, a methamphetamine addiction that started at age 16, as well as close and supportive relationships in adulthood with his mother and sisters.

With respect to Mr. Dean's criminal history, there can be little doubt that it is inextricably linked to his addiction to methamphetamine. When Mr. Dean is in recovery, he does not possess weapons.  In the past, when Mr. Dean has relapsed, he has re-associated with criminally involved and drug addicted peers in Portland.  In this milieu, firearms and illegal drugs have been prevalent.

Under the proposed plan of home confinement, Mr. Dean would return to the rural, ranch property originally owned by his grandparents in Blue River, Oregon, about 40 miles east of Eugene, and hours away from Portland.  This land has special significance for Mr. Dean.  He spent years of his early childhood there-- during the happiest time of his life-- learning about the outdoors

from his grandfather, under loving supervision and in total safety.

When Mr. Dean's grandfather died in 2014, Mr. Dean's mother and uncle inherited the property.  After Mr. Dean was released from prison in 2016, he had planned to return to Blue River, to live on the family property, assist with development projects, be supervised by the Eugene probation office, and reestablish himself away from old haunts in Portland.  But Mr. Dean's cancer diagnosis derailed those plans.  By the time he left the half-way house, Mr. Dean's established healthcare was in Portland and he was dependent on Portland-based oncologists for life-saving, though debilitating rounds of chemotherapy.

Under prior stints on supervision, Mr. Dean's whereabouts were not monitored electronically by a GPS location monitoring system.  Mr. Dean resided in Portland and had trouble maintaining his sobriety and his distance from acquaintances who were part of his criminal past.

The proposed plan of home confinement addresses Mr. Dean's history of problems on supervision and protects the public.  The Blue River property, as described by Mr. Dean's mother, is rural, semi-secluded and attached to [the] family's timber land."[70]  It is the antithesis of Mr. Dean's old way of life in Portland.

Mr. Dean has no history of tampering with or failing to comply with a GPS location monitoring system.  On the contrary, he has shown that he will abide by such a restriction.  In May of 2014, when Mr. Dean was detained pending trial in case no. 3:13-CR-00137-SI, the Court released him for two days, subject to GPS location monitoring, to attend his grandfather's funeral near Blue River.  Mr. Dean did not abscond, did not use controlled substances, and did not violate

---

[70] Exhibit 8, May 23, 2020 correspondence from Nancy Behm

**Page 23 MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(i) (COMPASSIONATE RELEASE)**

any other condition of release. He returned to the pretrial services office in Portland without incident and on schedule.  Under the proposed plan of confinement, Mr. Dean's abstinence from controlled substances could be closely monitored.  His property could be inspected without warning.  And the Court would always retain the discretion to return Mr. Dean to prison, in the event of a violation of the terms of the home confinement plan.

Under these highly protective and structured conditions, Mr. Dean, at age 41, with his current health complications, can serve out the balance of his sentence at his mother's rural home in Blue River without presenting a danger to the public.  Mr. Dean's mother understands the probation department's need to monitor the property and inspect it unannounced.  Her letter, attached as Exhibit 8, emphasizes the extent to which Mr. Dean's cancer has changed him and united his family in supporting him through a period of strict home confinement:

> "It was horrible for his family to know he was sick, really sick, in prison and not be able to help him. If we can help him now, we are desperate to do so. He is a big burl of a man but that is largely a façade. His health has been dramatically changed by cancer, its treatment and the resulting issues…I can easily drive him to any medically or legally required appointments…His sisters, Glyness and Maren, join me in asking you to let us try to help him stay alive."

Certainly, in a home confinement setting, Mr. Dean's conditions of confinement would be different from prison.  He would be able to talk to his doctors on the phone and schedule appointments with them based on his personal need for care, as opposed to the BOP's triaging. He could commence mental health treatment via video (as many have on pretrial and supervised release during the pandemic).  He could join virtual AA and NA meetings.   He would be able to hug his mother and see family members face to face more often.  He would eat a more nutritious and varied diet.  He could venture outside, do chores, and, as his mother's letter predicts, achieve a higher level of mental and physical health.  These aspects of the proposed home confinement do

**Page 24 MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(i) (COMPASSIONATE RELEASE)**

not render the confinement meaningless or the punishment unjust.  Mr. Dean has already spent 26 months in pretrial detention and prison under conditions that are uniquely punishing-- enduring chronic pain, urinary tract infections, and other symptoms of metastatic cancer without the ability to obtain medically necessary treatment or a full range of palliative care.  During the pandemic, Mr. Dean, along with the rest of the inmates at Sheridan, have been on lock down; programming has ground to a halt; day to day life in custody has become even more confining, with little assurance that locking inmates in will shut the virus out.

Mr. Dean's prior stints in prison have not accomplished the goal of deterrence.  But prior stints in prison have not been followed with the structure of an extended home confinement plan, enforced by electronic monitoring, in a uniquely rehabilitative and secluded environment.  The proposed plan of home confinement, with its options for addiction and mental health treatment, in a rural setting, with tools to monitor Mr. Dean's location and abstinence, is far more likely to promote long-term deterrence.

### D.    Policy Statements That Predate the First Step Act Do Not Constrain This Court's Independent Assessment of Whether Extraordinary and Compelling Circumstances Justify Mr. Dean's Immediate Release

In 28 U.S.C. § 994(t), Congress delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." The policy statement issued in exercise of that authority, U.S.S.G. § 1B1.13, provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness, (2) debilitating physical or mental health condition, (3) advanced age and deteriorating health in combination with the amount of time served, or (4) compelling

family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C). The commentary also includes a

fifth catch-all provision for "extraordinary and compelling reason other than, or in combination

with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the

Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n.1(D).

Simply put, these criteria offer limited guidance now, after the passage of the First Step

Act and the elimination of the BOP's gatekeeping role from the provisions of subsection

3582(c)(1)(A). "A majority of district courts have concluded the old policy statement provides

helpful guidance…[but] does not constrain [a court's] independent assessment of whether

'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(C)(1)(A)."

*United States v. Beck*, No. 13-CR-186-6, 2019 U.S. Dist. LEXIS 108542, 2019 WL 2716505, at

*6 (M.D. NC 2019) (collecting cases).

Said differently:

> Given the changes to the statute, the policy-statement provision that was previously
> applicable to 18 U.S.C. § 3582(c)(1)(A) no longer fits with the statute and thus does
> not comply with the congressional mandate that the policy statement must provide
> guidance on the *appropriate use* of sentence-modification provisions under § 3582.

*United States v. Cantu,* No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019)

(emphasis in original).

Even where courts have not deemed § 1B1.13 entirely inapplicable due to the lack of

amendment, they have held that judges have authority based on the catch-all provision in

Application Note 1(D) to find extraordinary and compelling reasons other than those listed. *See,*

*e.g.*, *United States v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, *3 (D. Me. July 11, 2019)

(stating that the existing policy statement provides "helpful guidance," but "is not ultimately

conclusive given the statutory change").

**Page 26 MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A)(i)**
**(COMPASSIONATE RELEASE)**

The government conceded this point in *United States v. Young*, agreeing that "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act." No. 2:00-CR-00002-1, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). The court in *Young* followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive: "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction." *Id.*

Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, present an extraordinary and compelling basis for a sentence reduction, regardless of whether it falls within one of the existing categories in § 1B1.13 commentary.

## IV.    Conclusion

For the foregoing reasons, Mr. Dean respectfully requests that the Court grant a reduction in sentence to time served, followed by supervised release conditioned by a period of up to 26 months of home confinement.

Respectfully submitted this 3rd day of June, 2020.

                       */s/ Tiffany A. Harris*
                       Tiffany Harris
                       Attorney for Defendant Fredric Dean