Tiffany A. Harris   OSB 02318
Attorney at Law
333 SW Taylor St., Suite, Ste 300
Portland, Oregon 97204
t. 503.782.4788   f. 503.217.5510
tiff@harrisdefense.com

Attorney for Defendant Fredric Dean

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>FREDRIC DEAN,<br><br>Defendant. | 3:18-CR-00119-SI<br><br>REPLY IN SUPPORT OF MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) COMPASSIONATE RELEASE |

Defendant Fredric Dean, through counsel, submits the following reply memorandum in support of his Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A). The New York Times tracks coronavirus infection rates in every state, including Oregon (below):


1

USDC Oregon Case 3:18-cr-00119-SI
Reply In Support of Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) Compassionate Release

As illustrated above, on June 7, 2020, after Oregon counties began to ease restrictions on social gatherings, commerce, and the like, our state experienced its highest daily spike in COVID-19 cases since the start of the pandemic in March.[1] As the *New England Journal of Medicine* explains, the boundaries between correctional institutions and their surrounding communities are "porous":

> …the federal Bureau of Prisons and certain states and municipalities have opted to suspend visitation by community members, limit visits by legal representatives, and reduce facility transfers for incarcerated persons…Despite these interventions, infected persons—including staff members—will continue to enter correctional settings.
> \*\*\*
> Despite security at nearly every nation's border, COVID-19 has appeared in practically all countries. We can't expect to find sturdier barriers between correctional institutions and their surrounding communities in any affected country.
> \*\*\*
> To promote public health, we believe that efforts to decarcerate, which are already under way in some jurisdictions, need to be scaled up; and associated reductions of incarcerated populations should be sustained. The interrelation of correctional-system health and public health is a reality not only in the United States but around the world.[2]

On May 31, 2020 (the last time defense counsel visited the BOP's website to prepare the pending motion), the BOP reported that 5,846 inmates and correctional staff had been infected by the coronavirus since the start of the pandemic and 67 inmates had died. (See Defendant's Motion

---

[1] "Coronavirus in Oregon: 146 New cases reported in highest single-day tally to date; one new death," *Oregonian*, (June 7, 2020) available at https://www.oregonlive.com/coronavirus/2020/06/coronavirus-in-oregon-146-new-cases-reported-in-highest-single-day-tally-to-date-1-new-death.html?fbclid=IwAR1wQ6fDeTmZigrXGIpIrLd9Pb3ZWg-u9qJRKgHKrgy__aEEH6v2-sUeVXM

[2] Matthew Akiyama, MD, "Flattening the Curve for Incarcerated Populations, COVID-19 in Jails and Prisons," New England Journal of Medicine, (May 28, 2020) available at https://www.nejm.org/doi/full/10.1056/NEJMp2005687; See also, CDC,

2

USDC Oregon Case 3:18-cr-00119-SI
Reply In Support of Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) Compassionate Release

at page 14.) Now, just over a week later, on June 9, 2020, there are 816 more cases of COVID-19 and 11 more inmate deaths.[3] Those figures do not include the "presumptive positives" that the Oregon Health Authority and many other states include in their tallies, to supply more accurate epidemiological information.[4]

The BOP's "COVID-19 Action Plan," highlighted in the Government's response, has failed to "flatten the curve" in BOP facilities, and inmates continue to be infected, sickened and killed by COVID-19 at an alarming rate, significantly higher than the rate of infection among the general public in the United States, Italy, or China.[5] Members of Congress, health experts, and district court judges have identified notable shortcomings in the COVID-19 Action Plan, including a failure to curb the continued transfer of inmates within the BOP system, the withholding of hand sanitizer, the omission of presumptive positive numbers from BOP infection data, and foot dragging in the implementation of Attorney General Barr's guidance calling for the release of high risk inmates.[6]

---

[3] BOP COVID-19 data, available at https://www.bop.gov/coronavirus (last visited June 9, 2020)

[4] Walter Pavlo, "Bureau of Prisons had a response plan for the pandemic but delayed action," *Forbes* (April 23, 2020) available at https://www.forbes.com/sites/walterpavlo/2020/04/23/bureau-of-prisons-had-a-response-plan-for-a-pandemic-but-delayed-action/#500cbd443d97

[5] For a comparison of infection rates within the BOP system and the general populations of the US, Italy, and China, see the data compilation charted by the New York Federal Defender at https://federaldefendersny.org

[6] "The Bureau of Prisons Must Do More to Flatten the Curve," April 23 Statement of Congressman Fred Keller, available at https://keller.house.gov/media/in-the-news/bureau-prisons-must-do-more-flatten-curve; Walter Pavlo, "Bureau of Prisons had a response plan for the pandemic but delayed action," *Forbes* (April 23, 2020) available at https://www.forbes.com/sites/walterpavlo/2020/04/23/bureau-of-prisons-had-a-response-plan-for-a-pandemic-but-delayed-action/#500cbd443d97; Joseph Neff, "Few federal prisoners released under COVID-19 emergency policies: A federal judge called the Bureau of Prisons Release Process 'Kafkaesque,'" *The Marshall Project* (April 25, 2020), available at https://www.themarshallproject.org/2020/04/25/few-federal-prisoners-released-under-covid-19-emergency-policies

3

USDC Oregon Case 3:18-cr-00119-SI
Reply In Support of Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) Compassionate Release

A growing number of district courts asked to weigh the risks of the pandemic to medically fragile inmates against the strength of BOP's remedial efforts have decided in favor of release—some even while recognizing the "conscientiousness and care" taken by BOP to "mitigate[e] the spread of COVID-19 in its facilities through cleaning and social distancing." *See, e.g., United States v. Ben-Yhwh,* CR NO. 15-00830-LEK, ECMF 206 (D. Hi. April 13, 2020)   Other district courts have voiced more skepticism of the COVID-19 Action Plan. *United States v. Atkinson*, 2:19-CR-55 JCM (D. Nev. April 17, 2020) at * 4 (First, testing inside prisons has been scant…which means that statistics about the number of infections already in BOP facilities are largely meaningless…second, the [COVID-19 Action] plan provides no additional protections for high-risk individuals.") *United States v. Esparza*, 1:07-CR-00294-BLW, 2020 WL 1696084 at *2 (D. Idaho April 7, 2020) ("Even in the best run prisons, officials might find it difficult, if not impossible, to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff: practicing fastidious hygiene and keeping a distance of six feet from one another."); *United States v. Burill*, 17-CR-00491 (N.D. Cal. April 10, 2020) (Federal Correctional Institutions, which had reported zero COVID-19 cases only weeks ago, *and despite the steps the BOP has taken to contain the disease within its facilities*, are now reporting numerous virus-related deaths.") (Emphasis added.); *United States v. Amarrah*, 2020 WL 2220008 (E.D. Mich. May 7, 2020) at * 8 (noting the discrepancy between the provisions of the COVID-19 Action Plan and the defendant's report of day to day realities in his facility).

Mr. Dean's own report of conditions at Sheridan FCI reflects broader concerns about the limits of the BOP's good intentions in the COVID-19 Action Plan.  Mr. Dean acknowledges that Sheridan has eliminated "chow lines" by delivering meals to inmates in their cells.  However, it appears Sheridan's "lock down" has simply shifted pockets of congestion to other areas of the

4

facility. For example, when inmates are not celled in, they are "stacked on one of five phones," queued up at computers to check emails, congregating in the shower area, waiting for an opportunity to bathe, or coming into contact with one another in different places. Mr. Dean reports there is no free soap and no hand sanitizer. According to Mr. Dean, about half the staff wear masks; the other half do not. Mr. Dean describes the quarantine period for newly transferred inmates-- touted in the COVID-19 Action Plan-- as a "yes and no." "Some guys get 14 days, some don't." And, as the Government concedes in its Response, the BOP, like the rest of the country, is hamstrung by the general scarcity of coronavirus test kits and "is using its strained testing resources" only in institutions with inmates who are known to be symptomatic. (Government's Response at p. 6.) This scarcity model of testing leaves facilities vulnerable to an uncontrolled outbreak, as seen at Terminal Island, Lompoc, Butner, and other BOP facilities. An investigation of a COVID-19 outbreak at a nursing home showed that, when facility-wide testing was done, "approximately one half of [identified] cases were among asymptomatic and presymptomatic persons who likely contributed to transmission," and thus, "symptom screening alone is inadequate to promptly identify and isolate infected persons in congregate settings such as correctional and detention facilities."[7]

The Government cites *United States v. Houghton* as a case in this district where Judge Robert E. Jones "denied a comparable compassionate release request." For important reasons, Mr. Houghton's case offers little guidance here. First, the district court rejected the premise that Mr. Houghton's history of childhood asthma, current hypertension and weight category (characterized

---

[7] CDC, "COVID-19 in Correctional and Detention Facilities—United States, February-April 2020," (last visited, June 9, 2020), available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm

5

USDC Oregon Case 3:18-cr-00119-SI
Reply In Support of Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) Compassionate Release

by the defense as obesity and by the district court as being overweight) amounted to a medical risk of more serious complications from COVID-19. Mr. Houghton's motion was not supported by a medical expert's opinion, and so the district court relied on its own assessment of the medical records and CDC checklists and guidelines to come to a decision about the risks to Mr. Houghton's health from a potential COVID-19 infection. Here, however, the medical review conducted by Dr. Thomas McNalley contributes to a well-developed medical record yielding ample evidence that Mr. Dean's specific health history leaves him vulnerable to dangerous or life-threatening complications from COVID-19. Second, during the pendency of his motion, Mr. Houghton became infected with COVID-19 (without apparent complications), and thus, he could not be fitted for an ankle monitor, could not have face to face contact with a probation officer, and could not report to a half-way house for urinalysis testing. These unfortunate realities complicated Mr. Houghton's release plan, and, thus, the district court was not persuaded that Mr. Houghton could be safely and effectively monitored at home. In Mr. Dean's case, the facts on the ground are very different and warrant a different result.

Mr. Dean can serve a period of home confinement under the proposed conditions without jeopardizing the safety of the community. None of Mr. Dean's criminal history involves the use of a firearm or weapon to injure, rob or threaten another person. The only evidence of assaultive behavior in Mr. Dean's background dates back 25 years, to a fistfight he took part in at age 16, resulting in a conviction for Assault in the Third Degree (a class C felony). Under today's juvenile code, it is unlikely that the same behavior would have been prosecuted in adult court or yielded a felony conviction.

The Government points to Mr. Dean's disciplinary record at Sheridan as evidence of his continued dangerousness. Government's Exhibit B is a complete record of Mr. Dean's infractions

6

at Sheridan FCI and the detention center, during different periods of incarceration, dating from 1999 through the present.  What those records establish is that, between the ages of 20 and 41, while confined in close quarters with other young, male inmates, both at a medium security prison and a detention center, Mr. Dean was never disciplined for fighting.  There are no infractions for an act of violence or for making a threat toward a fellow inmate or correctional officer.  Mr. Dean was never found to have possessed a weapon or illegal drug.  He was never punished for insubordination.  The "gambling" referred to by the Government covers two incidents in a period of five years.  One involved the use of postage stamps as winnings in a game of dice.  The other involved a deck of cards that had apparently been altered in some fashion.

The Government speculates that, if confined to his mother's property, and monitored with a GPS location device, Mr. Dean would resort to criminal activity in order to support himself.  This speculation is unfounded. Thanks to Mr. Dean's grandfather and the property he left to his children, Mr. Dean's family now has the resources to support Mr. Dean financially in his transition and is committed to doing so.

Finally, the Government contends that Mr. Dean is "receiving attentive medical treatment and falls far short of meeting the compassionate release statute's target."  As a preliminary matter, the parties disagree about whether the claim that Mr. Dean's medical care has been "attentive" finds any support in the record.  But more important to the court's compassionate release inquiry is the reality that, even under the care of a highly qualified and vigilant medical team, should Mr. Dean contract COVID-19, he is at a substantially higher risk of ICU intervention and death than members of the general public.

Although the Government's Response-- with a lone internet citation-- attempts to undermine Dr. McNalley's expert opinion regarding Mr. Dean's medical vulnerabilities, it does

7

not mount a credible challenge. The article cited by the Government "is related to breast cancer treatments, which cannot be extrapolated to Mr. Dean."[8] The patient group studied in the article was not followed after nine months, and so "it's not clear if their immunosuppression persisted."[9] Dr. McNalley, based on his medical training, familiarity with the relevant literature, and clinical experience treating "patients at end of life or with chronic, complex conditions," flatly disagrees that Mr. Dean has no residual risk of immune-compromise from his specific chemotherapy regimen.[10] But he also explains, in detail, that, "independent of chemotherapy exposure, persons with even a history of *cancer* are more likely to have a severe clinical course with COVID-19."[11] Dr. McNalley concludes that, based on a host of unique factors (including Mr. Dean's history of chemotherapy exposure, treatment with a cocktail known to cause lung damage and "cardiac effects," and "status within a "subcategory of patients who are post-chemotherapy but not yet considered cancer free"), if Mr. Dean were his patient, Dr. McNalley would "most certainly advise him to take all of the hygiene and social distancing precautions that the CDC recommends for high risk individuals."[12] "Nothing in the medical literature cited by the Government changes [his] opinion".[13]

If Sheridan is consumed by a COVID-19 outbreak, Mr. Dean's access to needed medical care is unlikely to continue in the manner contemplated by the Court, at the time of the original

---

[8] June 8, 2020 Addendum by Dr. Thomas McNalley, Attached as Exhibit 9.

[9] Id.

[10] Id.

[11] Id.

[12] Id.

[13] Id.

8

sentence. Thus, the most effective way to deliver medical care to Mr. Dean (in accordance with 18 U.S.C. § 3553(a)), is to return him to the care of his family and his community based physicians who can alleviate his constellation of symptoms and continue to monitor him while he is most at risk of a recurrence of cancer.

To a person, Mr. Dean's family views the property in Blue River as the best possible place for Mr. Dean to regain his physical and mental health, as well as his footing in the community, free from drugs and old patterns of behavior. Mr. Dean has shared that his grandfather's property in Blue River is a "very safe, calm, and healing environment." Mr. Dean has, at times, "contemplated suicide because [his] pain was so great." He shares that, if released to home confinement and eventual community supervision, he plans to restart his medical care, "catch up with my family, make sure my mom is going to be comfortable, pay on my child support, and try to find a way into my kids' lives…I want to be around for my family and be a good neighbor…I have an opportunity to work and not be a burden… I want to be a person that my daughter can look at and be proud of for how I turned my life around."

Mr. Dean has proposed a plan for home confinement on a rural, secluded property, with adequate safeguards and family support to protect the public. The pending motion should be granted because it is justified by extraordinary and compelling reasons, it is consistent with the goals of sentencing, and in accord with the Sentencing Commission's policy statements.

Respectfully submitted on June 9, 2020

/S/     Tiffany Harris
Tiffany A. Harris, Attorney at Law
Counsel for Defendant Fredric Dean

9

USDC Oregon Case 3:18-cr-00119-SI
Reply In Support of Motion to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A) Compassionate Release